Good morning, Your Honor. Brian Ho for the appellants. I'd like to reserve four minutes for rebuttal, please. By way of background, what we're looking at here is a review of a judgment of forfeiture that was issued in the underlying case, as well as an order granting import and denying import a motion for summary adjudication filed by the government. By way of background, Tai Lung Hong is a company that's in Hong Kong, formed under British law. Their primary business is the buying and selling of various types of seafood products, which include shark fins. In this case, Tai Lung Hong hired another company, which is based in Hawaii, called Tran and Yu, to go out to sea with a vessel owned by Tran and Yu to pick up shark fins for ultimate delivery to Guatemala. An American vessel? Yes, sir. And the significant point on the King Diamond II, which is the name of the vessel, is it was specifically documented with the Coast Guard under a registry endorsement. It wasn't endorsed as a fishing vessel. It was endorsed under a fishery registry. Under the law, no matter what a vessel is registered at, for purposes of statute, it becomes a fishing vessel if it does certain things. That's correct. That's absolutely correct. And the certain things that have to occur for purpose of this case — let me cover that just by saying that the acts upon which a violation are alleged to have occurred, Your Honor, is not that they went out and bought the shark fins. The buying and selling of shark fins in this fashion was lawful. They don't — They said that they store them and they transport them. Exactly. Which — And they did. No. They didn't because I think under the statute and the regulation as phrased, for example, if I were the vessel owner, it has to be the mission of my boat to go out and render assistance, for example, to a vessel — No, no, no. That's Fisher's question was when he said they did, they did transport them. They transported it for themselves. All right. Whoever they transported from, Fisher said they transported them. And they stored them. For themselves, Your Honor. If you look at the statute as it's phrased, it's basically — it prohibits the King Diamond II from providing support services to the vessels that they're buying the fins from. So, for example — They're not support services. Only if I had got the — You said it prevents them from providing support services. Isn't that the whole point? They are support services. No. They're not support services in the context of the foreign fishing vessel. It's — in my brief, I cited the grocery store example. If I go to the grocery store and I — I'm citing the example of the companies that go around to the citrus groves and buy agricultural fields, and they buy the produce and they store it and transport it to market. Middlemen. I can't address that. I'm from Hawaii. We don't have citrus. How do the pineapples in Hawaii or the coffee on the Big Island, are those all taken directly to market by the producers? The pineapples — the fields — the pineapples are produced by the company that ends up selling it to the eventual — Dole takes it directly to market. Exactly. They don't buy — well, let's take coffee. Are there small coffee plantations that don't have the wherewithal to transport their crop to market, and so they sell it to the wholesaler middleman? I am not familiar with that either, because I'm on a — I was trying to — Yeah, exactly. We're not big enough. Businesses aren't great enough. Yeah, I apologize. I apologize. Trying to localize the area. Exactly. But what I'm trying to — I can argue it anywhere. If you had an orange grove somewhere — Okay. — or a lettuce field or whatever, and the people sold it from the field directly to the wholesaler, would that be aiding the grower if — by picking it up there rather than at the ultimate store? Would that be aiding the grower? No, I don't think so. Why not? Because — and again, I think you have to look at the specific language of the Shark Finning Prohibition Act, along with the language from the Federal Register that's cited on page 25 of my brief, where it makes a distinction between providing support services and aiding and assisting fishing vessels at sea versus — It does include transport, the word transport, doesn't it? It does include the word transport, Your Honor. But the distinction that I'm trying to make that I'm not — What meaning would you give to the word transport? When would that be aiding? If you own one of these fishing vessels, and I'm coming to buy fins, or if I'm coming out with my own vessel, and you say to me, I need you to take some of my product in, or I need you to process some of my fish, or I need you to hold some of my fish because I'm too full or because I want to stay out, that's the kind of support services that are referred to in the statute and the regulation. I have to be out there as the mission of my vessel to support your activity, specifically the storage. I'm storing it for you. I'm transporting it for you. I'm processing it for you. That's what the regulation says. What would it say for you? Because — I mean, your brief talks about being an agent, for example. What is it that requires an agency kind of relationship where it's meant to be the benefit — intended to benefit the fishing vessel as opposed to serving both of our interests by, in effect, moving the market from the dock to the middle of the ocean, which seems to be what they've accomplished here. If you look at the plain language of the regulation, it says any vessel which is used for — Which regulation? Excuse me. It's Statute 16 U.S. Code 1802, Subpart 17. And it's cited on page 16 of my statute. We're talking here about the Magnuson Act. Yes, sir. And it's on page 16 of my brief at the very top. Under subparagraph B, it says aiding or assisting one or more vessels at sea in the performance of any activity relating to fishing, so on and so on. And so my — What there says agent? What says that we can't be scratching each other's backs? I mean, it seems to me you're positing here that the secondary vessel, your client's vessel here, has to be acting intended to be for the benefit of the one that's at sea. But I'm not so sure that this doesn't cover both situations. Obviously, if you have an adjunct, if your client were hired to come out and pick up stuff and were being paid by the fishing vessel, no question it's covered. That's not happening here. And you're arguing that's the distinction. Exactly. And I'm trying to find what in the statute says that to be assisting somebody else means that you have to be acting as an agent or be hired by or given compensation in some way by the fishing vessel as opposed to this situation, which seems to be moving the market from the dock to the middle of the ocean in order to gain a competitive advantage. You're going to sell to me instead of the guy at the dock. It's going to take you two weeks to go to Guatemala to sell this stuff, and you can sell it to me right here. That can be said to assist the fishing vessel. It may not be the motivation of your client, but it's part of what your client uses to induce the fishing vessel to sell to your client. Right. Okay. I see you've asked me three questions. One statement you made was the fishing vessel that's selling the product gets to save time by not having to deliver the product to Guatemala. My underlying argument on all of those types of statements is there is no evidence to show there's a time-saving or benefit. To answer the question you started with, and the point I'm trying to make is in this statute where it gives you examples of types of activities, supply and storage, refrigeration, transportation, and in this particular case, you've mentioned storage and transportation. The reason why under a reasonable interpretation of the statute there has to be an agency relationship for that activity is because if I'm carrying it for the foreign fishing vessel that provided it, then I'm providing storage to them. I'm providing transportation to them. But if I've bought it and it's my product, I'm not providing transportation for them. I'm providing it for myself. And so I'm not aiding and assisting that vessel by providing transportation services. I'm not aiding and assisting them, but providing them with storage. And that's the... You gave some other reference. Was it preamble to the... In the Federal Register, which appears on page 25 on my brief. Well, it's not your brief. What is it? This is the CFR? No, it's 67 Federal Register 6195 where it talks about... The quote is, because National Marine Fisheries Service interpretation of the act is that it targets fishing vessels and it was not meant to interfere with international trade, National Marine Fisheries Service has drafted this final rule not to directly affect the owners, employees of businesses that are engaged in regular domestic and international cargo shipments of and trade in shark fins. And this was the point that I was trying to get to in response to Judge Clifton's question, which is in my view of this case is there has to be a line drawn where trade and commerce of this product is lawful. And that's what the Federal Register says. The act was not intended nor designed to interfere with trade and commerce. That's exactly what my client was doing. They're in the business of buying and selling various seafood products, including shark fins. In their mind, they've hired a boat which can go out and lawfully purchase shark fins, deliver them for my client's own benefit to their ultimate destination. They're engaged in trade and commerce. What the regulation prohibits and makes unlawful is for an entity to engage as the mission of the vessel providing support services as articulated in 16 U.S.C. 1802 as the mission of the vessel, and that's not what happened in this case. And so that is a problem or that was a point that the underlying trial judge didn't see, and I think that is one of the key issues in this case is, you know, they're engaged in trade and commerce. It's the only business of your client to, as far as the shark fins are concerned, to pick them up and deliver them to the port. That's it. They did nothing else. They didn't provide any fuel, any water, any supplies. They didn't bring any personnel out. They didn't do anything in support of the fishing vessel or — And then they deliver them to the wholesaler in the port? No, no, no. They delivered them to Guatemala and then shipped them back to Hong Kong, where their offices are. They process it and then they sell it to their customers. So it's all for the benefit of my client's own business. I'm trying to — I'm looking at the 67 Federal Register 6194 at 6195, and it says, the prohibition of landing shark fins without corresponding carcasses extends to any vessel, including a cargo or shipping vessel, that obtained those fins from another vessel at sea. Any such at-sea transfer of shark fins effectively would make the receiving vessel a fishing vessel, as the receiving vessel is acting, quote, in support of fishing, close quote. Thus, the receiving vessel is prohibited from landing shark fins without corresponding carcasses under this final rule. That's a totally different situation. There are — prior to the enactment of the Shark Finning Prohibition Act, there used to be boats that went out of Honolulu Harbor, picked up fins for the benefit of the fishing boats and brought them back in, not — not for the benefit of my client, but for the benefit of the actual — And that — and that paragraph that Judge Fisher read to you, it doesn't say it has to be for the benefit of the vessel they pick it up from. It says that any such at-sea transfer would make the receiving vessel a fishing vessel. I think that, Your Honor, it — that applies to a different set of circumstances, because what that language in the Federal Register is referring to is the landing of shark fins in a U.S. port, which — which is unlawful. But somewhere else is something that says that if you find it at sea, it's deemed to be landing. It's presumed to be landing. That's in the Act. If it's a fishing vessel. And this says if it's a fishing vessel, it's the recipient of any at-sea transfer. Yeah, I apologize. I didn't — I don't have handy both of those paragraphs. Yeah, the Magnuson Act says for purposes of subparagraph P, there is a rebuttable presumption that — Well, just to go back, since I'm looking at that page, this final rule establishes a rebuttable presumption that any shark fins possessed onboard a U.S. fishing vessel were landed from any fishing vessel, were taken, held, or landed in violation of these regulations, and so on, on the weight. So — and then this paragraph that I read follows that particular paragraph. So I guess I'm not sure I understand what you're saying about if they were landed at a U.S. port. It says the prohibition of landing shark fins without corresponding carcasses. Right. That's the violation in question that that language refers to. The prohibition against landing shark fins is landing shark fins without the bodies in a U.S. port. It's not — It doesn't apply if it goes to a foreign port. That's correct. Okay. And it also doesn't apply — I mean, I don't know how to describe where it is, but a few paragraphs back, maybe eight or ten paragraphs back, the Fishery Service is talking about alternatives it rejected. One of it appears to be a third alternative would have extended the landing prohibition to all vessels, including non-fishing cargo vessels, whether or not such vessels are operating in support of fishing activity. I take it you're identifying your client's boat as a non-fishing cargo vessel. Exactly. They had no fishing gear. They didn't engage in any fishing activity. The sole mission was to go out, pick up Tai Lung Hong's cargo, deliver it to the port of Tai Lung Hong's choice so they could ship their cargo back to Hong Kong. The only problem that we face in this case is the fact that there's language in the statute and the regulation that says it's unlawful to possess fins if you're a fishing vessel. And as I argued in my brief, there's both factual and legal grounds to — as I read to you, the prohibition of landing shark fins without corresponding carcasses extends to any vessel, including a cargo or shipping vessel, that obtained those fins from another vessel at sea. Any such at sea transfer, and that means cargo vessels, too, of shark fins effectively would make the receiving vessel a fishing vessel, as the receiving vessel is acting in support of fishing. The only way I can explain that, Your Honor, is to say that language specifically and only applies to the limited context of a cargo vessel that wants — that has landed these fins in a U.S. port. I don't believe that that language in that section of the statute is trying to engage in trade and commerce. And I think that that Federal Register language also has to be interpreted reasonably to assume that the cargo vessel referred to in that hypothetical is landing fins for the benefit — as an agent of the foreign vessel from which it got the fins. At the very least, what we have is an inherent conflict in the statute where it says, NIMS never intended for this law to interfere with the international and domestic trade and commerce and transportation of this product. That's clear. That's exactly what my client was doing, and that's the only thing they were doing. So being caught in a catch-22 where somebody is saying, yes, they were engaged in trade and commerce, and yes, they were buying product for their own benefit, and yes, they weren't necessarily providing a service as an agent for these foreign fishing vessels, you know, it's — that's where one of the problems lies on the legal side. The statute is not clear to a reasonable person who's trying to conduct business on what is and what is not lawful conduct. If somebody had come to me for a legal opinion on this and given me the set of facts of this case, I would have told them that it was lawful and not a violation of the statute. Then they'd be going after your malpractice insurance. Maybe true, Your Honor. Maybe true. But I don't believe so. And I wouldn't have filed an appeal, Your Honor, if I didn't think that it was a legitimate basis for it. We're not suggesting that. Right, right. I understand that. Thank you. May it please the Court, Mary Lindberg for the appellee. Your Honor, you have discussed, in fact, the nub of the problem, which was, is the statute requires that the vessel be a fishing vessel before there is a violation of the Shark Finning Prohibition Act, and it becomes a violation to have possession of the shark fins without the carcasses. The facts concerning this action, what happened  in dispute, what is in dispute is if these facts add up to making the King Diamond II a fishing vessel. And our position is that they absolutely do. The plain language of the statute, the factual acts that occurred, the legislative history of the statute, all require the conclusion that the King Diamond II was a fishing vessel. Absolutely. But let's assume that the companies are in the business of, you know, they stay out the boat, boats there all year long, except when it comes to be refueled. And that's where it sells all of its shark fins. That's its basis for its base for sales. And people come out and buy the shark fins there. Are all the people who buy the shark fins guilty of aiding or assisting? Well, I think Judge Moskowitz talked about one instance in which he said that if someone goes out in their own boat and buys one shark fin to have to make shark fin soup out, he did not think that that added up to an aiding and assisting in any activity relating to fishing, because it was not significant. Here — Well, let's say it is significant. I mean, people go out all the time in boats and buy it there. That's where they sell the shark fins. I'm not sure that that is the case here, Your Honor. And there are no facts. The only facts I know about are that this King Diamond II went to the Central Pacific Ocean, and by prearrangement — this is a big organization — prearrangement went with — met with 23 foreign-flagged fishing vessels for the purpose of purchasing the shark fins. And then landing them where? They were going to land them in Guatemala. Okay. Now, if the foreign-flagged vessel itself had landed in Guatemala, would there have been any violation of any act? No. No. So the fact is, and if the King Diamond was a Guatemalan-flagged vessel, there would have been no violation. There would be no violation. There are restrictions on — to the jurisdiction of the United States and the high seas over foreign-flagged vessels and what they do. The debate or the questioning between the preamble — what effect we give to this preamble — I had been reading, as you may have gathered, the prohibition of landing shark fins in the following language in that paragraph as essentially supporting the government's position. But it does make a distinction, apparently, because in the prior paragraph it makes a point of possessed on board a U.S. fishing vessel or landed from any fishing vessel. Then it goes down in the paragraph — the following paragraph that I read says the prohibition of landing shark fins if the landing takes place at a non-U.S. port. Does this paragraph then apply, or is it, as he says, not intended to address the question of landing at a foreign port? The U.S. flagged vessel is in — I don't — I think the language is actually clearer than that. In the statement, any such at-sea transfer of shark fins effectively would make the receiving vessel a fishing vessel, as the receiving vessel is acting in support of fishing. In other words, it makes it a fishing — Wait a minute. Yeah. Maybe you should look at it, because it says, Thus, the receiving vessel is prohibited from landing shark fins, and so on. So, again, it's focused on the landing aspect. Okay? So here, if — I take it your position would be if the King Diamond had been — was it intercepted at sea? It was intercepted on the high seas. Yeah, it was. So it was charged in that fact with possession. That's correct. Okay. Now, would this paragraph apply to it regardless? It — the paragraph would have applied to it because they would have — but they didn't land the shark fins. No, they didn't. Had they landed the shark fins, this paragraph would have applied to it. Not if they'd landed them in Guatemala. If they were found in possession of — this is the U.S. flagged vessel, the King Diamond But you're relying on the possession, not on the fact that they were going to land in the United States. We — that's — no, we weren't. We weren't. At the time they were intercepted, the violation of possession had already occurred. Right. So if they had gotten all the way to Guatemala, they would still have been in violation of the shark — But not the landing. But not the landing.  They would have been — So it's possession. That's what we're talking about. Exactly. But this — the statement — But, Judge, Judge Fischer asked you about that paragraph, and he read you the final sentence, and the question is, does that mean the paragraph — the first sentence starts, the prohibition of landing. The last sentence ends, thus it's prohibited from landing. So the question is, does that paragraph apply only to vessels that are going — that are planning on landing? No. The middle paragraph, the middle sentence, any such at-sea transfer of shark fins effectively makes this vessel — receiving vessel a fishing vessel, is a general rule because — and the reason is because transferring the shark fins at sea is in support of fishing. That is — it's an activity that — Well, that's the question. Can you take that sentence out of the context of the preceding sentence and the following sentence, both of which talk about landing? Yes, you can, because it doesn't — it doesn't restrict the word. Any is used, and it says — and when you make this vessel a fishing vessel, that makes the vessel the type of vessel that is in support of fishing and is aiding and assisting. And I'd like to go a little bit further and say that bringing the market for the shark fins to the vessels themselves, it's hard to maintain that that does not assist the fishing vessels. It makes it more convenient. And, in fact, in Appellant's brief on page 20, around Appellant's opening brief, around six lines down, he's talking about a — they're talking about a different subject, which is why the King Diamond II, what they were doing in support of the fishing vessels, was unlike what the Kosium did when it collected the fins and brought them to the King Diamond II. But the quote is — and this is from Appellant — But if the — if a seller chooses a point of sale, they have to meet the conditions  And that's the point of sale. The King Diamond II was required to meet the foreign vessels at locations convenient for their operations. The foreign vessels were not required to travel to the King Diamond II. If the King Diamond II did not meet with these boats, no transactions occurred. Here, there's an admission that the King Diamond II provided a convenient point of sale for the — for the foreign fishing vessels. But if the — if a seller chooses a point of sale because it's convenient to them, it could be anywhere. It could be in — it could be in Guatemala. It could be anywhere. This is where I operate, and this is — I mean, my business is to sell at sea because it's convenient to me. Does that make every purchaser — someone who's a sailor? Well, I think we're getting a little hypothetical because I only know about this purchaser. I know, but I'm just trying to see whether the fact that it's convenient to the seller to sell on a particular location means that you're assisting them if you go to that location. I believe it does. You are aiding and assisting in an activity relating to fishing. I don't know enough about the situation. Do you know, for example, what port these ships customarily sailed out of? I do not. Or how often they would expect to go back. And part of what I sit here and wonder about, well, you may not be able to make the sail unless the King Diamond is where these ships are, but it might not make much difference to these ships where they go to. Suppose, for example, they're themselves going out of Guatemala. I have no idea. But suppose a — or Panama or some non-U.S. port where there is no legal restriction on the possession of shark fins or on marketing of shark fins. And so, heck, they could have kept those shark fins and sailed back to Guatemala City or whatever the port in Guatemala is and sold them there. But if here's somebody right there willing to buy them now, sure, we'll sell them now. I'm not so — And that's a — Well, is that assistance to the ship? If it didn't really make much difference to that ship where they sold them? I believe it assists in some activity relating to fishing, which is the selling. And we mustn't forget that the King Diamond II had cold, hard cash. They spent approximately $348,000 in cash, which they supplied to these ships at the time of the sale. And at that — at the time, the shark fins, no matter if it was a huge benefit or a small benefit, the ship's fishing did no longer have to worry about where they were going to sell their shark fins. Brought the market to the shark fins, to the — You view the King Diamond as a buyer acting in its own interest. Then the analogies which Appellant has suggested may not be quite so far-fetched. Am I really assisting Ralphs when I buy my water to bring to the Pasadena courthouse? Would anybody consider that to be assisting Ralphs? No. That would not be assisting Ralphs, and no one would consider it assisting Ralphs. But a closer analogy, you know, Appellant indicated that their analogy that they used was that it was like the inserver or the — me going down to a grocery store and buying some product, aids and assists, you know, the grocery store in an activity relating to fruit growing or something like that. But the closer analogy is the one you gentlemen — the judges touched upon, which is a farm is growing produce. A trucking company comes to that farm, purchases the produce, but then takes it off the hands of the farmer and then is the middleman and takes it to the grocery store chain to sell. That actually helps the farmer, because he gets his money. He doesn't have to worry about storing any longer once it's purchased. But there's a problem with this. Because this is the farmer who's in the business of whether it's coffee or oranges or whatever. But the ships they're buying these shark fins from are presumably not in the business of gathering shark fins. Sharks are allegedly gathered as an adjunct to some other form of fishing. And the problem is they don't want to keep the carcasses. The carcasses aren't useful, so they hack the fins off, dump the carcasses, because what they're really out there to catch is, I don't know, tuna. Tuna. It is a byproduct. Well, it's a byproduct. And so, I mean, in my heart of hearts, I suspect the problem here is that tuna winds up going to American Samoa. And that's the U.S. port, so they can't take the shark fins into American Samoa. But I'm all speculating, because we have zero evidence with regard to where these ships would go otherwise. And so, you go back to our farmer. The farmer's in the business of growing coffee in Hawaii. But along the way, he's got a half dozen macadamia nut trees along the road. And he gets a few macadamias. And he doesn't really care if he tosses them in the bushel and takes them into Kailua-Kona, or whether he... Somebody comes and buys them from me here, that's fine. It really doesn't make much difference because it's an adjunct to what he does. So, is the farmer assisted? Measurably, maybe a tiny little bit, but that's not what the point of the transaction is. And even Judge Moskowitz says, you know, if you just wanted to go out and buy a shark fin, well, that wouldn't be assistance, even though, yeah, marginally, it assists the boat by buying the couple of shark fins the consumer might want, too. It gets pretty murky when you don't really know what the ships are doing, or where they'd go, or what they'd do with those shark fins. And I think that at that point, we have to look at the legislative history of the Act, and we have to look at what the purpose was. The purpose was to discuss... But you also have to look at, and I want you to include this in the answer, because part of the problem here, I mean, I puzzled over this statute. Why is it written this way? And it turns out it appears to be written this way as part of a compromise, because they didn't want to interfere with the international trade in shark fins. They didn't want to send boats to sail around our economic exclusive zone. They didn't want boats coming into Honolulu Harbor, to prevent boats from coming to Honolulu Harbor and be reprovisioned. So they carved out all sorts of stuff. And as you answer the question, I understand the point of the statute, too, but I wonder if the carve-outs start to swallow the statute by making it so difficult to figure out who's covered by this. I don't think it's a difficult statute to figure out. And the congressional intent, and I — in the supplemental excerpts of record, there's a very long section on congressional intent. They want to — the closer you get to the practice of shark finning, that's what they want to disrupt. That's why it's not a crime for a Matson liner to stop in Guatemala and take on a cargo of shark fins and carry it to Hong Kong. That's more attenuated from the actual shark finning. Here, they are right there with the boats that are participating in this act, which we want to disrupt and to — The analogy to the trucker going along the groves and picking up — the analogy would be is that some truckers could pick up the oranges, but not others. It would depend on whether they were, in the case of this case, foreign flag or not. The only thing that is being reached here is the period of time between the pickup and the landing, because the landing is not illegal, because it's not a U.S. port. It's only the possession, intermediate possession, and it's only possession by a U.S. flagship. So that's the narrow target that this statute reaches, as I understand it. The critical point is that it is — in jurisdictional matters, it's a U.S. flagship. Correct. And the other critical point is that it meets the definition of aiding and assisting in any activity — Right. Yeah. But still, it has to be a small — Right. — which is that it had to be a foreign — a U.S. flag, and it had to be caught while on the high seas. It had to be on the high seas. If it — it would be completely illegal for any vessel to be in the EEZ and possess shark fins without corresponding carcasses. But it's a matter of — Actually, that's not true. If this ship had landed — let me just find out this. I know what your position is. If the King Diamond had landed in Guatemala, would you still have been able to charge it for possession, even if it hadn't been picked up on the high seas? I think there would have been some proof problems. But you would have tried to charge it, assuming you could prove it. Right. Assuming — You got them right at the dock. You saw what they were doing. And you knew you had a witness or something that could tell you how they — You couldn't get them for the landing, but you could get them for the possession, which necessarily preceded the landing. Yes. Okay. I just want to point out that one of the alternatives considered by INFAS that it rejected — they call it the second alternative — would have prohibited the possession of shark fins without corresponding carcasses by all foreign fishing vessels whenever they're in the U.S. EEZ, even if not engaged in fishing. And they didn't do that, either, because it said, well, that would disrupt the navigation routes and be an infringement on the right of freedom of navigation, and so it's beyond the intent of the Act. And that's what I started to be concerned about, the carve-outs, because we're considering all these other factors, and what the statute winds up covering turns out to be a fairly small sliver. And does that sliver cover the states? It may be a small sliver, but when you look at the — if you look at the legislative history and you look at the problem, and if you look at the number of sharks that are killed in this matter with the assistance of this — this — the King Diamond II, because although they were not involved in the shark finning, the fact that they made the market for it, you know, there's upwards from 11,000 to 20,000 sharks that were involved in the 64,000 pounds of shark fins. And, you know, sharks, they're slow to mature, hard to recover from depletion. And since they're the top — the top feeder in the ocean, when you really make a — have a problem with them and they're being sliced, their fins are being sliced off and not keeping the meat, then no one has said the meat is inedible of a shark. It's just not profitable. And that is the compromise as well. You are allowed to catch shark and sell their fins, but you're not allowed to have shark waste — waste the product and be able to carry thousands and thousands of more pounds on your ship because you don't have the rest of the carcasses. Where are these shark fins now? Shark fins were sold. By whom? They were — the — they have — the Magnuson Act has a — they're not contraband per se. There are ways that shark fins are illegal. When fish is seized — These particular shark fins. These particular shark fins. The government seized them? The government seized them and we had a hearing on it. No, we did not sell them. The Tai Long Hong was allowed to bond out the shark fins and take them away. It's provided for under the Act itself. The Court agreed to it. They sold them. And what we are — what we are now seeking to forfeit is the $618,000. We did not sell the shark fins. I'm not quite sure why that policy comports with the statute. If your whole problem is you want to limit the distribution of these shark fins. But all right, that's your concern. The bond was more than they made in profit, wasn't it? The bond was more than we made in profit, and then we actually are trying to forfeit them the profit that they made. The bond was $775,000. What we are seeking to forfeit is the $618,000 remaining after that. Thank you very much. Thank you. We'll give you two minutes. I thought I reserved four. Two is fine. You reserved it, but you ran out. Okay. First of all, let me say that there's no evidence on the record that the foreign flag fishing vessels engaged in shark finnings. It's possible they had the shark bodies on board. We don't know, so please don't consider the political statement, Ms. Lundberg. There were an awful lot of shark fins. But it was from 26 vessels. So, you know, who knows? But the other point I wanted to make is I think Judge Clifton has hit the nail on the head. There's no evidence on the record to reach the conclusions that Judge Moskowitz did in the underlying case. And on the legal side of things, I think the statute with its carve-outs are sufficiently vague when you're looking at the conflict between encouraging trade and commerce versus what is aiding and assisting acting as an agency capacity, as I argue. So what I would ask this Court to do is two things. Invalidate the Shark Finning Probation Act in the limited context as I've set forth in my brief. If you're not willing to do that, then send this case back down for further evidentiary proceedings with some guidance on how the statutes and regulations ought to be interpreted. Because without that, we're flying blind. There was no other precedent that Judge Moskowitz had to operate on. If we upheld what the government did here, you'd get lots of guidance. I don't. And you dodged, you know, a lawsuit. Well, there's another companding case, a civil penalty case, that is pending with NOAA. And so this not only has consequences for losing the $618,000, which represents the fair market value of what these fins were actually sold for, but there's also a civil penalty case. And so one will obviously impact the other. Thank you for your time, Your Honor. Thank you, Counsel. Thank you both very much. It's very interesting.
judges: Reinhardt, Fisher, Clifton